J-S56025-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CLAYTON CARTER III | : | |
| | : | |
| Appellant | : | No. 429 EDA 2020 |

Appeal from the Judgment of Sentence Entered August 29, 2019,
in the Court of Common Pleas of Chester County
Criminal Division at No(s):  CP-15-CR-0003375-2017.

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                   **FILED:  APRIL 23, 2021**

Clayton Carter III appeals from the judgment of sentence imposed after a jury found him guilty of first-degree murder and other related charges.  Upon review, we affirm.

The detailed facts are fully set forth in the trial court's opinion.  Briefly, this matter arose out of a neighbor dispute gone too far.  Some time prior to 2015, Carter and his family moved into his inlaw's house next door to the victim, George Jennings.  Over the years, there was a lot of tension between Carter and his neighbors, but especially between him and Jennings. Jennings tended to harass, antagonize, call Carter names, and use derogatory language towards him.  On August 7, 2017, and into the next morning, this dispute culminated in Carter shooting and killing Jennings.

_____

[*] Retired Senior Judge assigned to the Superior Court.

Throughout that day, Jennings engaged in various activities to antagonize Carter. In the final act, around 11 p.m., Carter returned from the store and saw that Jennings moved his vehicle closer to Carter's house. Carter got out of his truck, went into the house, got a loaded gun, and hid it in his pocket. Carter went back outside to move his truck, and while he was trying to parallel park, Jennings shined a light at him. Carter got out of his truck and confronted Jennings. At some point, when they were face to face, Carter claimed that Jennings pulled out a knife and thought he was going to stab him. Carter pulled out his gun and shot Jennings in the head. Jennings fell backwards. Carter was not sure if he hit Jennings, and so he shot him in the head again. Carter was arrested and charged.

After the shooting, the police searched Carter's home. Three shotguns and two revolvers were found in various places throughout the house, some of which were loaded.

Additionally, a knife was found in the grass at the scene. It had Carter's DNA on it but did not have Jennings'. Jennings' wife did not recognize the knife or ever know her husband to carry or own such a knife.

Prior to trial, the Commonwealth filed a motion *in limine* to introduce into evidence the five firearms found in his house in addition to the one used to shoot Jennings. The defense objected. Following a hearing, the trial court granted the Commonwealth's motion.

On June 13, 2019, a jury found Carter guilty of first degree murder, possessing an instrument of crime ("PIC") (possessing a handgun with intent

to employ it criminally), and tampering with or fabrication of physical evidence;[1] he was acquitted of two other PIC charges.  The trial court sentenced Carter to life without parole.  Carter filed a post-sentence motion, which the court denied.

Carter filed this timely appeal.  Carter and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

On appeal, Carter raises the following four issues:

> I. Considering the ample evidence of provocation presented, was the finding of guilt on the charge of murder of the first degree . . . against the weight of the evidence?
>
> II. Did the trial court err in allowing evidence of five firearms owned by [Carter] in addition to the firearm used in the shooting?
>
> III. Did the trial court err in allowing hearsay statements made by [Jennings] to Detective Edwards on March 26, 2015?
>
> IV. Did the trial court err in allowing Dr. Daniel K. Brown to testify regarding stippling and opinions regarding distances from which shots must have been fired where [the] opinion testified to was not provided to defense prior to trial?

Carter's Brief at 4 (citations omitted).

In his first issue, Carter claims that the verdict for first degree murder was against the weight of the evidence.  Specifically, Carter argues that given the substantial evidence of provocation, the jury could not have found malice. According to Carter, Jennings' repeated acts of harassment created an intense passion which would render a reasonable person incapable of cool reflection.

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 907(a), and 4910.

Carter's Brief at 15. Therefore, Carter claims the trial court erred in denying his weight claim.

When reviewing a challenge to the weight of the evidence, our standard of review is as follows:

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. **Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.**
>
> * * *
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> * * *
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. **Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.**

*Commonwealth v. Clay*, 64 A.3d 1049, 1054–55 (Pa. 2013) (citations omitted) (emphasis added). Absent an abuse of discretion, the trial court's decision will not be disturbed. *See Commonwealth v. Griffin*, 515 A.2d 865, 869 (Pa. 1986). An abuse of discretion "is not merely an error in judgment. Rather, it involves bias, partiality, prejudice, ill-will, manifest unreasonableness or a misapplication of the law." *Commonwealth v. West*,

937 A.2d 516, 521 (Pa. Super. 2007). By contrast, a proper exercise of discretion "conforms to the law and is based on the facts of record." *Id.*

Initially, we note that Carter does not specify how the trial court abused its discretion; he merely argues evidence favorable to him and, essentially, asks us to reweigh the evidence. Based upon our standard of review for weight claims, we cannot do so. **Clay**, **supra**. Nonetheless, after a review of the record and the trial court's rationale for denying Carter's weight claim, we conclude that the trial court did not abuse its discretion.

In explaining its rationale for denying Carter's weight claim, the trial court noted that critical to a first degree murder conviction is a finding that the killing was done with malice, *i.e.*, there was an intent to kill, there were no circumstances reducing the killing to voluntary manslaughter, and the killing was without lawful justification or excuse. The trial court reviewed the evidence and found it supported the jury's conclusion that Carter acted with malice, and was not justified in killing Jennings', despite the evidence of Jennings' provocation. The court explained:

> On cross examination, Ms. Jennings admitted, that in the past, her husband had told her that he intended to make [Carter] "uncomfortable" so that he would move from his father-in law's home because [Carter] was not a friendly or good neighbor. There was evidence presented of Jennings's poor behavior during the day prior to the shooting that was labeled "provocation" by [Carter]. However, poor or even rude behavior on the part of Jennings certainly didn't warrant or excuse [Carter's] use of deadly force. [Carter] made a conscious decision to arm himself with a handgun in the absence of any physical or verbal threat. He admitted he did not expect a physical threat. Although the act of carrying the handgun on his property was not an illegal act, it

was circumstantial evidence that [Carter] was prepared to act with deadly force absent any physical or verbal threat from the victim, or any such threats having made by the victim in the past.

Additionally, we considered the jury's finding, beyond a reasonable doubt, that [Carter] fabricated evidence by placing the knife at the scene of the shooting. Thus, the jury concluded that Appellant did not only arm himself with the small handgun he concealed, but that he also took the folding knife with him, and prior to the police arriving, he placed it at the scene of the shooting to create justification for his use of force.

Moreover, [Carter] fired a second shot at Jennings because he indicated he wasn't sure he hit him with the first shot. He told detectives that he shot the victim a second time because he saw the victim move after the first shot and the knife was in the victim's hand. Given that [Carter] planted the knife at the scene and Ms. Jennings was watching from her window and indicated she did not see her husband move after the first shot, it is most likely that [Carter's] second shot merely confirms his intent to kill Jennings. The video evidence from a neighbor's security system clearly records the sounds of both shots, emphasizing how long the 11-12 second period of silence really was. During that time, Appellant did not step back from the alleged threat and assess whether Jennings was incapacitated. Instead he stepped closer to the alleged threat and aimed the pistol at Jennings face before firing the second shot. As previously noted, the jury determined that [Carter] placed the knife at the scene. Hence, we find no merit in [Carter's] contention that the second shot was a result of his thinking "that [Jennings] was going to get back up and get [him] with the knife."

Trial Court Opinion, 4/23/20, at 12-13 (citations and footnotes omitted).

Under these facts, the trial court determined that the weight of the evidence supported a finding beyond a reasonable doubt that Carter acted with a willful, deliberate, and premeditated intent to kill Jennings, and that intent outweighed any evidence of justification based upon Jennings' provocation.

The trial court therefore concluded that the verdict for first-degree murder was not against the weight of the evidence.

Accordingly, Carter is not entitled to any relief on this claim.

In his remaining three issues, Carter claims that the trial court erred in admitting certain evidence at trial. Specifically, Carter contends that the trial court erred by allowing into evidence: 1) additional firearms he owned, 2) hearsay statements the victim made to a police detective about an incident in 2015; and 3) an expert's opinion that was not provided to the defense prior to trial. As our Supreme Court has explained, "[t]he admissibility of evidence is a matter solely within the discretion of the trial court. This Court will reverse an evidentiary ruling only where a clear abuse of discretion occurs." **Commonwealth v. Johnson**, 638 A.2d 940, 942 (Pa. 1994) (citation omitted). "Generally, an appellate court's standard of review of a trial court's evidentiary rulings is whether the trial court abused its discretion; however, where the evidentiary ruling turns on a question of law our review is plenary." **Buckman v. Verazin**, 54 A.3d 956, 960 (Pa. Super. 2012) (citations omitted).

In his second issue, Carter claims that the trial court erred in allowing the Commonwealth to introduce into evidence five firearms he owned in addition to the firearm he used during the shooting. Carter's Brief at 22. According to Carter, evidence of these other firearms was unfairly prejudicial because none of them were used during the murder. **Id.** at 25-26. He maintains that evidence of two incidents where Carter used larger guns to

ward off Jennings, which the defense introduced to show the animosity and antagonism between Carter and Jennings, was sufficient for the Commonwealth to show that he owned other guns. Carter's Brief at 26.

The threshold inquiry regarding the admission of evidence is whether the evidence is relevant. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact." *Commonwealth v. Spiewak*, 617 A.2d 696, 699 (Pa. 1992). In addition, evidence is only admissible where the probative value of the evidence outweighs its prejudicial impact. *Commonwealth v. Story*, 383 A.2d 155, 160 (Pa. 1978).

Generally, as Carter argues, where a weapon cannot be specifically linked to a crime, that weapon is not admissible as evidence. *Commonwealth v. Robinson*, 721 A.2d 344, 351 (Pa. 1998). However, here, the Commonwealth offered evidence of the other firearms to show that Carter had a premeditated plan to kill Jennings. The Commonwealth argued that, during prior incidents, Carter threatened Jennings with other larger guns he owned.[2] But this time, he intentionally chose his Ruger handgun, the barrel of which was only 2.75 inches, so he could conceal it and kill Jennings, rather than just defend himself. In explaining its rationale for granting the

_____

[2] Carter owned and had access to other weapons not conducive to concealment, specifically, three long barrel firearms and two additional handguns, both bigger in size than the handguns used on the night of the shooting.

- 8 -

Commonwealth's motion allowing Carter's other guns into evidence, the trial

court stated:

> In this case, [Carter's] intent was a material issue of fact the jury was required to decide in their deliberations. They were charged in determining whether [Carter] acted with malice and premeditation when he killed the victim. The firearm [Carter] selected to put into his pocket and take with him while he engaged with the victim, in light of the variety of firearms of various sizes owned by [Carter], was directly related to this material issue. [Carter] chose to take the Ruger .380, a handgun small enough to hide in his sweat jacket pocket, instead of a variety of larger firearms that could not be easily hidden from view. By choosing the Ruger, [Carter] was able to approach Jennings without making him aware that [he] was armed with a deadly weapon. This fact makes the presence of malice more probable and supports a reasonable inference or presumption that [Carter] acted with premeditation. This is particularly true in light of [Carter's] statement to police that prior to the night of the shooting, he had brandished a long barrel firearm or shotgun when Jennings confronted [him] at his front door and Jennings had backed down and left.
>
> [During argument on the Commonwealth's motion *in limine*,] [d]efense counsel indicated that he was going to be eliciting testimony regarding the 2015 incidents between Carter and Jennings to show Jennings's prior antagonistic conduct related to [Carter]. He agreed that those incidents were relevant to show the history of the relationship between the two. Both of those confrontations ended when [Carter] displayed a firearm to Jennings and he backed down and left [Carter's] property . . . .
>
> The court gave careful consideration as to whether the probative value of the evidence that [Carter] had access to additional firearms would unfairly prejudice [Carter]. In the present climate, where mass shootings are no longer uncommon in our communities, the fact that [Carter] owned multiple firearms may have the potential to inflame the jury. After weighing all the factors, we determined the probative value outweighed any potential prejudice for the following reasons: (1) all the weapons in question were legally owned by [Carter]; (2) there was going to be evidence of [Carter's] ownership of other firearms admitted through his videotaped interview with detectives; (3) the agreed

upon relevance of evidence of the 2015 altercations with Jennings and defense counsel's representation that he was going to be seeking admission of evidence of at least one of the 2015 incidents; and (4) as noted above, evidence of additional, larger firearms previously employed by [Carter] to warn off Jennings, goes directly to the material issue of intent and malice in [Carter's] choice of the small, easily concealed firearm.

We are guided by the principle that extremely prejudicial evidence, including prior crimes or wrongs, may be admissible when relevant for a purpose other than to show bad character, *i.e.* motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. The courts also permit the admission of prejudicial evidence to tell the complete story, finding that when the probative value outweighs any unfair prejudice it is admissible. In this matter, the legal ownership of additional firearms is not a bad act and is therefore less prejudicial than a prior crime or bad act. Moreover, the evidence of other accessible firearms goes directly to show a material fact, [Carter's] intent and malice, and provides a more complete picture of what [his] choices were on the night of the shooting. Under these circumstances, we found the probative value outweighed any possible unfair prejudice[.]

Trial Court Opinion, 4/23/20, at 14-17 (quotations and citations omitted).

Based upon the trial court's thorough consideration and explanation for allowing information regarding Carter's other firearms into evidence, we conclude that the trial court did not abuse its discretion or commit an error of law. Carter is entitled to no relief on this issue.

In his third issue, Carter claims that the trial court erred by allowing a detective to testify to statements Jennings gave about an incident on March 26, 2015, involving Carter and Jennings. These statements indicated that Carter followed a neighbor, Theresa Lyons, and her two young children down the street. Because he thought this was odd, Jennings confronted Carter.

Carter maintains that these hearsay statements depicted him as an aggressor, and were prejudicial. Carter's Brief at 28.

Furthermore, Carter claims that, although the trial court acknowledged in its 1925(a) opinion that Jennings' statements were hearsay, its conclusion that their admission was harmless as cumulative evidence was also error. Carter's Brief at 31. According to Carter, Kelly Jo Blasé's statements about the incident differed from Jennings', and therefore were not cumulative. *Id.*

As acknowledged by the trial court, this evidence was hearsay, and was improperly admitted into evidence. However, as also noted by the trial court, the same incident was described by another witness to the incident who testified at trial. Trial Court Opinion, 4/23/20, at 18. Blasé testified that she noticed her neighbor, Theresa Lyons, and her two young boys in the street, and that she was verbally engaged with Carter. Blasé saw Lyons grab the boys' hands and quickly start walking home. Blasé and Jennings walked over to Lyons and Carter and followed her home. As Blasé and Jennings were coming back, they saw Carter walking slowly with a gun, watching them. This behavior caused Blasé to feel shaken and scared. She called the police. N.T., 6/10/19, at 217-220.

Based upon our review of the record, we agree that Blasé did not state that Carter followed Lyons and her children. However, as the trial court noted, Blasé's rendition of the incident was substantially similar to the statements Jennings gave to the detective. It is evident from her testimony that the atmosphere created by Carter's behavior was threatening and caused the

Lyons to feel sufficiently uncomfortable that she quickly needed to return home and be escorted by Blasé and Jennings. Erroneously admitted evidence that is cumulative of other, untainted evidence is harmless error." ***Commonwealth v. May***, 656 A.2d 1335, 1343 (Pa. 1995).

Furthermore, even if this were not cumulative evidence, we observe that "[n]ot all errors at trial, however, entitle an appellant to a new trial, and [t]he harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial . . . ." ***Commonwealth v. West***, 834 A.2d 625, 634 (Pa. Super. 2003), *appeal denied,* 586 Pa. 712, 889 A.2d 1216 (2005) (quoting ***Commonwealth v. Drummond***, 775 A.2d 849, 853 (Pa. Super. 2001), *appeal denied,* 790 A.2d 1013 (2001) (internal citations and quotations omitted)). "An error may be deemed harmless, *inter alia,* where the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." ***See Commonwealth v. Young***, 748 A.2d 166, 193 (1999).

Considering the circumstances of this incident as discussed above, the jury was presented with overwhelming evidence of Carter's guilt. Any prejudicial effect from the admission of this evidence was so insignificant by comparison that it could not have contributed to the verdict in this case.

Therefore, we find that the trial court's admission of these statements, although hearsay, constituted harmless error. Carter is entitled to no relief on this issue.

In his last issue, Carter claims that the trial court erred in allowing Dr. Daniel Brown[3] to testify at trial regarding specific distances from which the shots were fired because the details were not included in his expert report. Carter's Brief at 33. Specifically, he claims that Dr. Brown's expert report only stated that there was "evidence of intermediate-range firing" but did not define what was meant by this phrase and the specific distances encompassed by it. As a result, Dr. Brown's opinion as to how far away Carter was when he shot Jennings both times was a surprise to the defense. Carter's Brief at 41.

Essentially, Carter argues that Dr. Brown's testimony exceeded the scope of his report. Generally, an expert may not testify to matters beyond the fair scope of the expert report. To determine whether the testimony goes beyond the fair scope of the report, we must examine the facts and circumstances of the particular case. We are guided by the following:

> [I]n determining whether an expert's trial testimony falls within the fair scope of his pre-trial report, the trial court must determine whether the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness. In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." *The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from making a meaningful response,*

---

[3] Dr. Brown is an associate medical examiner for the City of Philadelphia. He conducted the autopsy on Jennings after the shooting and prepared a report and testified as to his findings.

*or which would mislead the adversary as to the nature of the appropriate response.*

***Woodard v. Chatterjee***, 827 A.2d 433, 442 (Pa. Super. 2003) (citations and quotation marks omitted) (emphasis in original).

Here, the trial court concluded that Dr. Brown's testimony did not go beyond the fair scope of his report. In reaching this decision, the trial court explained:

> [Carter] was in possession of the expert report for almost two years. During that time, [Carter] had an opportunity to inquire and investigate what Dr. Brown, a forensic pathologist, meant by the term "intermediate-range". It is self-evident that the fact finder would need to have that term explained as it was not defined in the report itself. Thus, [Carter] was aware that further investigation was warranted upon his review of the expert report.
>
> We find that Mr. Green [defense counsel] completed such an investigation given the content of his cross-examination of Dr. Brown and his statements to the court. During Dr. Brown's cross-examination, Mr. Green referenced a recognized expert in the field of forensic pathology and gunshot wounds, Dr. DiMaio, and questioned Dr. Brown as to his familiarity with "any authorities who note stippling up to thirty-six inches from shaft barrel guns." Mr. Green also stated to the court that he reviewed "substantial authoritative publications, both the Dr. DiMaio manuscript and the authoritative articles . . . that contradict what Dr. Brown said about eighteen to twenty-four inches." The record shows that prior to trial Mr. Green prepared his challenge to Dr. Brown's opinions as to distance in inches should they differ from his own investigation. Furthermore, the most telling statement by Mr. Green to the court is his admission that "[he knew that] this stippling question [as it relates to distance] was a potential issue in the case forever, it's always been a gunshot case." In consideration of the materials available to Mr. Green prior to trial that were used in the cross-examination of Dr. Brown, we overruled [Carter's] objection as follows:
>
>> So [the court] took a look at Commonwealth Exhibit 16, which is the autopsy report. And what the report does say

on both gunshot wound "A" and "B" is 'evidence of intermediate range firing'. I Googled it. It came up with six inches to thirty inches. I think, Mr. Green, given your experience as a trial attorney, that's pretty clear what that means. And it's easily found, if it's not. So given the fact that you had the information regarding the fact that it was intermediate range, you used it in your cross-examination with the article that you pulled up, I'm going to overrule your objection.

Trial Court Opinion, 4/23/20, at 25-27. Under these circumstances, the trial court found that Carter was not prevented from making a meaningful response to Dr. Brown's opinion and was not mislead as to the nature of an appropriate response.

Given the trial court's explanation, we conclude that the court did not abuse its discretion or commit an error of law in allowing Dr. Brown to testify regarding the specific distances from which Carter shot Jennings. Accordingly, Carter is not entitled to any relief on this claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/23/21

- 15 -